IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LETTUCE ENTERTAIN YOU ENTERPRISES, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:21-CV-198-RP |
| HOTEL MAGDALENA JOINT VENTURE, LLC, | § § § | |
| Defendant. | § § § | |

## ORDER

Before the Court is a motion for summary judgment filed by Defendant Hotel Magdalena Joint Venture, LLC, ("Defendant"), (Dkt. 30). Plaintiff Lettuce Entertain You Enterprises, LLC ("Plaintiff") filed a response, (Dkt. 32), and Defendant filed a reply, (Dkt. 34).[1] Having considered the parties' arguments, the factual record, and the relevant law, the Court will grant Defendant's motion.

## I. BACKGROUND

### A. Defendant's Restaurant

Defendant owns and operates a restaurant in Austin called "Summer House on Music Lane" within a boutique hotel called "Hotel Magdalena." (Mot. Summ. J., Dkt. 30, at 2). Opened in 2020, the restaurant is situated on Music Lane, just off South Congress Avenue, and serves breakfast, lunch, dinner, and drinks. (Id.; Am. Compl., Dkt. 10, at 4). While the parties contest whether the restaurant qualifies as "upscale," dinner entrée prices at the restaurant generally range from $25 to $40. (Menu, Dkt. 30-11, at 9). Defendant says it chose to use the "Summer House on Music Lane"

---

[1] Defendant filed a unredacted version of its motion for summary judgment under seal, (Dkt. 30-14). Plaintiff filed an unredacted response, (Dkt. 33-2), and Defendant filed an unredacted reply, (Dkt. 36).

title to "evoke a 1970s Texas lake house atmosphere" and as a nod to the musical history associated

with the site. (Mot. Summ. J., Dkt. 30, at 19). At least one representative for Defendant testified that

"Summer House" was also the name of a restaurant in the hotel that used to occupy the site. (Moore

Depo., Dkt. 30-10, at 18). Defendant's logo is shown below in the two formats it commonly uses:

 

(Mot. Summ. J., Dkt. 30, at 19).

### B. Plaintiff's Restaurant

Plaintiff is a restaurant company that owns or licenses over 120 restaurants across the

country. (Am. Compl., Dkt. 10, at 3). One of these restaurant chains is called Summer House Santa

Monica. (*Id.*). While the name might suggest the restaurant began in Santa Monica, the first location

was actually opened in Chicago, Illinois in 2013. (*Id.* at 4). Plaintiff called the restaurant "Summer

House Santa Monica" to evoke a warm, sunny atmosphere with California-inspired food. (Mot.

Summ. J., Dkt. 30, at 13). In 2014, Plaintiff obtained a trademark registration for Summer House

Santa Monica, issued as U.S. Reg. No. 4,586,071. (Am. Compl., Dkt. 10, at 3). In 2015, Plaintiff

opened another Summer House Santa Monica in Bethesda, Maryland, a third in Chicago O'Hare

International Airport in 2016, and a fourth in the Charlotte-Douglas Airport in North Carolina. (*Id.*;

Pl.'s Resp., Dkt. 32, at 1). It plans to open several more over the coming years. (Pl.'s Resp., Dkt. 32,

at 1). In 2020, Plaintiff opened a restaurant called ABA, which is "across the street" from Summer

House on Music Lane and serves upscale Mediterranean food. (*Id.* at 1–2). Plaintiff's "Summer

House Santa Monica" mark is shown below:

SUMMER HOUSE
SANTA MONICA®

(Mot. Summ. J., Dkt. 30, at 2).

### C. History of the Suit

Sometime in 2019 or 2020, before Defendant opened its restaurant, Plaintiff learned of

Defendant's plans to use the name "Summer House on Music Lane" and sent Defendant a cease-

and-desist letter urging the company to pick a different name. (Am. Compl., Dkt. 10, at 9). The

parties briefly negotiated the issue before Defendant ultimately proceeded with the name "Summer

House on Music Street" and opened its restaurant in November 2020. (*Id.* at 9–10). On March 2,

2021, Plaintiff filed suit, alleging that Defendant's use of the name "Summer House" infringes its

trademark. (Compl., Dkt. 1). Plaintiff also brings claims for unfair competition and false designation

of origin. (Am. Compl., Dkt. 10, at 12–14). Plaintiff alleges that the use of the term "Summer

House" has created confusion among its customers, many of whom come from Texas to try its

Illinois and Bethesda restaurants of the same name. (*Id.* at 3–5). Plaintiff further argues that the

shared name creates confusion because both restaurants market themselves broadly online and

through similar social media pages. (*Id.*).

On January 11, 2023, Defendant filed a motion for summary judgment on all claims. (Mot.

Summ. J., Dkt. 30). In its motion, Defendant argues that Plaintiff has failed to show any substantial

evidence of confusion between the marks. It argues that confusion is unlikely because the marks

look dissimilar and, as the restaurants market themselves as upscale establishments, consumers will

choose their restaurant carefully. (*Id.* at 2). It argues that Plaintiff's mark is weak, and even further

weakened by a settlement made with another restaurant in Florida allowing it to retain the name

"Siesta Key Summer House." (*Id.*). It argues that Plaintiff's lack evidence of actual confusion and

have failed to provide either expert testimony or general surveys on the likelihood of confusion. (*Id.*

at 5, 18) Finally, Defendant emphasizes that it operates in geographically separate markets, as the nearest "Summer House Santa Monica" in Chicago is over 1,000 miles away from its "Summer House on Music Lane." (*Id.* at 16).

Plaintiff contends that many of Defendant's arguments are questions of fact for the jury to decide, not for a decision on summary judgment. (Pl.'s Resp., Dkt. 32, at 7). They contend that the mark is strong and confusion is made more likely by the fact that "Summer House" is the dominant and memorable feature of both marks. (*Id.* at 11).



(Defendant's sign)



(Plaintiff's sign)

Plaintiff further argues that the parties share overlapping customers because of travel between the states, particularly at Plaintiff's airport locations, and that there has been limited evidence of confusion already. (*Id.* at 14, 18). Plaintiff says that the advertising channels are identical because both promote their restaurants through similar sites and media. (*Id.* at 17). Finally, Plaintiff argues that a jury could find bad faith because Defendant opened Summer House on Music Lane knowing that Plaintiff was considering building restaurants (albeit of different names) in Austin. (*Id.* at 17).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## III. DISCUSSION

### A. Overview

To prevail on a trademark infringement claim, a plaintiff must establish: (1) ownership in a legally protectable mark; and (2) infringement by demonstrating a likelihood of confusion. *Bd. of Supervisors for Louisiana State Univ. Ag. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008). Infringement claims under Texas common law are analyzed under the same framework as federal trademark law. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010).

Texas unfair competition claims are also governed by the likelihood of confusion standard. *Scott Fetzer Co. v. House of Vacuums*, 381 F.3d 477, 484 (5th Cir. 2004).

For the purposes of this motion, Defendant does not contest Plaintiff's ownership of a legally protectable mark in Summer House Santa Monica. (Mot. Summ. J., Dkt. 30, at 4). Instead, Defendant's motion focuses exclusively on the likelihood of confusion. "In a trademark infringement action, the paramount question is whether one mark is likely to cause confusion with another." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985)). At summary judgment, a plaintiff must demonstrate that confusion is not merely possible, but probable. *Id.* (citing *Smack Apparel Co.*, 550 F.3d at 478). The Fifth Circuit instructs that "[w]hile likelihood of confusion is typically a question of fact, summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.'" *Smack Apparel*, 550 F.3d at 474. Courts examine confusion by evaluating the eight "digits of confusion": (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) care exercised by potential purchasers; and (8) actual confusion. *See, e.g.*, *Xtreme Lashes*, 576 F.3d at 227. No single factor is dispositive, and courts should consider each digit in light of the specific circumstances of each case and in the context that a consumer perceives them in the marketplace. *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019), *as revised* (Jan. 29, 2019), *as revised* (Feb. 14, 2019); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).

## B. Whether Defendant Has a Strong Trademark

The "type of trademark" refers to the strength of the asserted mark. *Xtreme Lashes*, 576 F.3d at 227 (5th Cir. 2009). A mark's strength depends on: (1) the mark's position along the distinctiveness spectrum, and (2) "the standing of the mark in the marketplace." *Am. Rice, Inc. v.*

*Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008). The Court will first address the mark's distinctiveness, (i.e., its conceptual strength) before turning to its standing in the marketplace (i.e., its commercial strength).

As to their conceptual strength, marks are placed into one of five categories of distinctiveness (from least to most distinctive): generic, descriptive, suggestive, arbitrary, or fanciful. *Xtreme Lashes*, 576 F.3d at 227. Defendant argues that the mark is at most suggestive because it evokes a sense of California style and cuisine. (Mot. Summ. J., Dkt. 30, at 4). Plaintiff argues that its mark is suggestive and could even be arbitrary when considered without the reference to "Santa Monica." (Pl.'s Resp., Dkt. 32, at 6–7). Here, the Court agrees that a reasonable jury could find the mark anywhere from descriptive to arbitrary, but would most likely find the mark suggestive because it alludes to the theme and cuisine of the restaurant through "exercise of the imagination." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020). While suggestive marks are "inherently distinctive" and are entitled to protection, the Fifth Circuit has also made clear that they are "comparatively weak" compared to arbitrary or fanciful marks. *Id.*; *Xtreme Lashes*, 576 F.3d at 227–28. Overall, the conceptual strength weighs against summary judgment because a reasonable jury could find it entitled to some protection.

Defendant's argument is on stronger footing as to the mark's commercial strength. A mark's commercial strength refers to its standing in the marketplace. *Am. Rice*, 518 F.3d 321. In particular, the marketplace does not refer exclusively to the geographic area, but also to the overall industry. *Firebirds Int'l, LLC v. Firebird Rest. Group, LLC*, 397 F. Supp. 3d 847, 862 (N.D. Tex. 2019) (citing *Bd. of Regents of the Univ. of Hous. Sys. v. Hous. College of Law, Inc.*, 214 F. Supp. 3d 573, 587 (S.D. Tex. 2016)). In *Firebirds*, another case involving a trademark restaurant name, the Northern District of Texas found that the relevant marketplace encompassed both the restaurant's geographic area as

well as the nationwide restaurant industry. *Id.* Given the similarity of *Firebirds* to the instant case, the Court will adopt that approach here.

Geographically, there is little genuine contest that Plaintiff's mark lacks recognition in the State of Texas. At the time Defendant opened Summer House on Music Lane, Plaintiff only used the mark in its Chicago and Bethesda locations, and since that time, it has expanded to North Carolina. (Mot. Summ. J., Dkt. 30, at 6). The only evidence of the mark's recognition in Texas is limited to the possibility that some travelers from Chicago or Bethesda might know the mark from their home city and therefore might be confused if they also run into Defendant's mark in Austin. (*Id.*; Pl.'s Resp., Dkt. 32, at 3). The other evidence is that diners at ABA might possible see the Summer House Santa Monica logo among the list of 100+ restaurants owned by Plaintiff. (Pl.'s Resp., Dkt. 32, at 18). Plaintiff includes no surveys demonstrating any recognition of the mark in the State of Texas or Austin. (Mot. Summ. J., Dkt. 30, at 6). As discussed *infra* Section III.I, there is negligible evidence of actual confusion in Texas. Overall, Plaintiff has provided no significant evidence supporting the mark's recognition in Texas, much less in Austin. *See Firebirds*, 397 F. Supp. 3d at 863 (noting that the complete lack of "commercial recognition in Texas" rendered the mark's commercial strength comparatively weak). Plaintiff's mark's position within the Texas market is extremely weak.

Plaintiff's mark fares little better in the restaurant industry. Defendant argues that the strength of the mark is severely diminished by the extensive third-party usage of the term "Summer House" by other restaurants. (Mot. Summ. J., Dkt. 30, at 6–7). In Rehoboth Beach, Delaware, an unaffiliated restaurant named "Summer House" has been operating since 1977—indeed, one of Plaintiff's executives visited the location as a child. (Meers Depo., Dkt. 30-2, at 54). Although the restaurant operates fewer than 150 miles from Plaintiff's Bethesda location, there does not appear to

be any evidence in the record of confusion between the two restaurants. (Mot. Summ. J., Dkt. 30, at 7).



(The Summer House in Rehoboth Beach (Mot. Summ. J., Dkt. 30, at 7)).

Another restaurant in Corona del Mar, California also uses the name "Summer House" and has signage remarkably similar to Plaintiff's. Again, there does not appear to be any evidence of confusion between the two marks presented in the record.



(The Summer House in Corona del Mar, California (*Id.* at 8)).

A third unaffiliated restaurant in Florida also uses the name. In 2021, Plaintiff sued this restaurant, called "Siesta Key Summer House," arguing that the restaurant's use of the name "Summer House Siesta Key" violated its trademark. (*Id.* at 9). The case settled with Plaintiff consenting to a change of the same to "Siesta Key Summer House." (*Id.*).

Beyond these three "Summer House" restaurants, Defendant identifies at least four other dining establishments in the United States that also use the name "Summer House" as well as dozens of other hospitality services, including a pop-up restaurant from Eleven Madison Park. (*Id.* at 10; EMP Summer House, Dkt. 30-5, at 28).[2] Plaintiff argues that these marks are not indicative of commercial weakness because they have sued at least one of the Summer House's and are not required to sue the others until it becomes clear that they will have a significant impact on their rights.[3] (Pl.'s Resp., Dkt. 32, at 8 (citing *Progressive Concepts, Inc. v. Hawk Elecs*, 2009 WL 10705254, at*4 (N.D. Tex. Aug. 20, 2009)). But Plaintiff's cite to *Progressive* deals with laches—it does not relate to the commercial strength of a mark.[4] Regardless of their market size, the fact that several restaurants around the country use the same mark without confusion strongly suggests that the mark is commercially weak.

---

[2] Plaintiff contests these websites as "hearsay" without explaining why. (Pl.'s Resp., Dkt. 32, at 10). But the websites are not offered for the truth of the matter asserted therein—Defendant is not actually trying to establish that the halibut in the Massachusetts Summer House was indeed "perfectly seasoned." (Summer House Yelp, Dkt. 30-5, at 35). Rather, the pages are offered to show potential consumer perception and awareness of the "Summer House" mark. Courts often allow such evidence to be admitted or judicially noted. *See, e.g., Mateo v. Hsin, Inc.*, No. 7:19-CV-419, 2021 U.S. Dist. LEXIS 197645, at *29 (S.D. Tex. 2021) (taking judicial notice of information provided on a company website and noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web") (citing cases); *Brooks v. United Dev. Funding III, L.P.*, No. 4:20-cv-00150-O, 2020 U.S. Dist. LEXIS 197662, at *100 (N.D. Tex. Apr. 15, 2020) (taking judicial notice of existence of website and report posted online);.*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 746 n.3 (N.D. Tex. 2018) (taking judicial notice of advertisements on website).

[3] Plaintiff's argument that third-party use of the mark does not diminish its commercial strength fundamentally contradicts the premise of this lawsuit. Plaintiff is suing Defendant because its use of the name "Summer House" allegedly creates "confusion," "substantial damage," and "irreparable harm." (Am. Compl., Dkt. 10, at 13). It is difficult to accept that Defendant's use of the name causes substantial and irreparable harm while the use of the name by at least three other restaurants has no effect whatsoever on its commercial recognition. If Defendant's use creates substantial harm, then third-party use must likewise diminish the mark's commercial strength. If extensive third-party use does *not* diminish commercial strength, then there is little reason to think Defendant's use will cause substantial harm. But a plaintiff alleging a likelihood of confusion cannot have the argument both ways.

[4] Similarly, Plaintiff argues that the Ohio restaurant's use of the mark is not relevant to the strength of the mark because of Plaintiff's pending litigation against it. (*Id.* (citing *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980))). But *Exxon Corp.* does not actually state the quote that Plaintiff's use, and at any rate, the case would still leave several other restaurants currently using the mark without litigation against them.

The sheer number of restaurants and venues using the name "Summer House" is highly indicative of the mark's commercial weakness. *See Springboards To Educ.*, 912 F.3d at 815 ("[A]lthough the fact that three of Springboards' marks are suggestive would normally indicate that the marks are strong, the strength of Springboards' marks is substantially undercut by their lack of recognition in the market and widespread third-party use."); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986) (explaining common use of "XL" mark with various consumer goods "dilute[d] the strength of the mark"); *Firebirds*, 397 F. Supp. at 862 ("[E]xtensive third-party usage of the term 'Firebird' in related and unrelated industries militates against finding Plaintiff's mark commercially strong.").

As in *Firebirds* and *Springboards*, the mark's mild conceptual strength is overshadowed by its commercial weakness. *Firebirds*, 397 F. Supp. 3d at 863; *Springboards To Educ.*, 912 F.3d at 815. While the mark is likely suggestive, third-party use is extensive, and there is virtually no evidence of recognition in the Texas market. As a whole, the digit weighs in favor of Defendant.

### C. Similarity of the Marks

When considering the similarity of the parties' marks, courts look at "the mark's appearance, sound, and meaning." *Smack Apparel Co.*, 550 F.3d at 479. "The more similar the marks, the greater likelihood of confusion." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 454 (5th Cir. 2017). "Even if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 228). "In assessing mark similarity, we 'give more attention to the dominant features of a mark.'" *Id.* Courts also consider the context in which the marks appear, as well as the color schemes and design elements of the marks. *Id.* (citing *Smack Apparel*, 550 F.3d at 480).

Beginning with appearance, the marks look distinct. Beyond the very premise of the suit—that they share the same first two words of the name "Summer House"—the differences are far more apparent than the similarities. Plaintiff's mark uses a serif font with wide, centered spacing. (Mot. Summ. J., Dkt. 30, at 14). Defendant's mark uses a much more flowing font, with thin lines flowing above and below the logo. (*Id.*). Defendant's mark puts "House" on a second line and shapes the mark as part of a coherent circle. Both are green, though different shades, and Defendant's logo is contrasted with a pastel orange sun. (*Id.*). Defendant's other mark uses entirely different colors. (*Id.*). Defendant's mark also matches the font and visual theme of the hotel it is situated in: Hotel Magdalena.



(Mot. Summ. J., Dkt. 30, at 19; Hotel Magdalena Website, Dkt. 30-10, at 26).

Plaintiff argues that "Summer House" is the dominant feature of each mark. (Pl.'s Resp., Dkt. 32, at 11). Specifically, Plaintiff points to the physical signs used by both parties at their restaurant location. "Summer House" does appear far larger in both parties' signs than the text of

the location. But the physical signs also highlight the key differences between the two: Defendant's

logo is visually quite distinct from Plaintiff's:



(Pl.'s Resp., Dkt. 32, at 11).

In short, beyond the dominant feature, (i.e., the words "Summer House"), there are many

more differences in the marks than similarities. Given that nearly every design element appears to be

different between the two marks, a reasonable juror would find it difficult to believe that the two

"have a common origin or association." *Xtreme Lashes*, 576 F.3d at 228; *Picnik Holdings LLC v. Bento*

*Picnic, LLC*, No. 1:18-CV-897-RP, 2019 WL 2515310 (W.D. Tex. June 18, 2019), *aff'd* 797 Fed.

Appx. 169 (5th Cir. 2020) (denying a preliminary injunction where the two marks "look very

different"). Beyond the shared words and general color, there is no visual link between the two

marks. Thus, the element weighs in Defendant's favor.[5]

---

[5] Plaintiff argues that this weighing of visual similarity is a task exclusively for the jury. At least within the
Fifth Circuit, this is not so. *See Streamline*, 851 F.3d at 454 (discussing visual similarity of marks); *Smack Apparel*,
550 3d. at 479 (same); *Xtreme Lashes*, 576 F.3d at 228 (same); *Picnik Holdings*, 2019 WL 2515310 at * 5 (same).

The meaning of the mark also tends to favor Defendant more. Defendant chose the "Summer House on Music Lane" mark to describe the "Austin 70's lake culture" and pay homage to the fact that local musician Willie Nelson used to own the site. (*Id.* at 13). Moreover, the restaurant previously on the site used to be called "Summer House." (*Id.* at 13–14). Plaintiff, by contrast, chose the "Summer House Santa Monica" name to evoke a feeling of "sunshine all year round" with "West Coast vibes" that emphasize the "California-inspired" menu. (*Id.*). While the evidence is limited that consumers in fact associate Defendant with Willie Nelson or the lot's storied history, (Pl.'s Resp., Dkt. 32, at 12), the term "Music Lane" carries a distinct meaning from "Santa Monica," and there is no evidence that consumers assume Defendant is attempting to recreate a California-inspired menu.

### D. Product Similarity

Both parties offer similar services. Both are American-style restaurants that provide upscale, sit-down service to patrons. (*Id.* at 13). The fare is not literally identical, but it is similar, and this digit weighs in favor of Plaintiff.

### E. Outlet and Purchaser Identity

Consumer identity weighs strongly in favor of Defendant. "The smaller the overlap between the retail outlets for and the predominant consumers of [the parties'] goods, the smaller the possibility of confusion." *Streamline*, 851 F.3d at 455 (citing *Exxon Corp.*, 628 F.2d at 505). Defendant argues that the geographic separation of the consumer bases is so strong that it should be dispositive in this case under the *Dawn Donut* doctrine. (Mot. Summ. J., Dkt. 30, at 16 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959))). That Second Circuit doctrine states that a "registrant is not entitled to enjoin the junior user's use of the mark" if the two are "confined to sufficient distinct and geographically separate markets, with no likelihood that the registrant will expand his use into the defendant's market . . . ." *Dawn Donut*, 267 F.2d at 364. More recently, this

Court has affirmed that it will still apply the doctrine and consider geographic separation to be potentially dispositive. *See Wilson v. Tessmer Law Firm, PLLC*, 483 F. Supp. 3d 416 (W.D. Tex. 2020) (citing *Cross Trailers, Inc. v. Cross Trailer Mfg. & Sales, LLC*, 363 F. Supp. 3d 774, 782 (W.D. Tex. 2018)). *See also Am. Rice*, 518 F.3d at 329 ("This Court has previously refused to grant a remedy to a plaintiff where that plaintiff was not using the allegedly infringed mark in the same trading area as a defendant.").

Ultimately, despite this Court's continued adherence to *Dawn Donut*, the doctrine does not dispose of the case here by itself. While the consumer overlap is extremely minimal, it is not exactly zero. (Pl.'s Resp., Dkt. 32, at 14). Moreover, because Plaintiff operates a national chain of restaurants, it is at least foreseeable that they could one day open a Summer House Santa Monica in the Austin area.[6]

While not entirely dispositive, the different consumer bases still weigh substantially in Defendant's favor. At their closest locations, the two restaurants are at least 1,000 miles away from each other. (Mot. Summ. J., Dkt. 30, at 15). Restaurants predominantly serve local consumers, and there is no reason to think that there is any special overlap between diners in Austin and diners in Chicago or Bethesda. (*Id.*). Plaintiff claims that the "customers overlap" because "thousands of people from Texas (and Austin) have made reservations at Summer House Santa Monica restaurants . . . ." (Pl.s' Resp., Dkt. 32, at 14). This is, at best, circumstantial evidence of overlap. It does not directly show that consumers do in fact eat at (or even recognize) both restaurants. Beyond a sole Yelp review, Plaintiff's evidence does not show that there has been a single overlapping customer. (Yelp Review, Dkt. 30-1, at 15–16).

---

[6] One representative testified on this matter, but the deposition is sealed to protect trade secrets. (Bell Depo., Dkt. 30-1, at 30).

Both as to the strength of its mark and the hypothetical overlapping customers, Plaintiff argues that many online users from Texas visit its site. (Pl.'s Resp., Dkt. 32, at 2–3, 14–15). But Plaintiff conflates the numbers for its entire restaurant group—which encompasses over 120 establishments—with those for Summer House Santa Monica specifically. (*Id.*; Am. Compl., Dkt. 10, at 3; Def.'s Reply, Dkt. 34, at 3). Moreover, the company's own numbers show that only a small fraction of visitors to its site come from Texas. (Bell Dec. Dkt. 33-1, at 91).[7] Again, Plaintiff could have potentially created an issue of fact on consumer overlap by conducting a customer survey, but it did not provide any such evidence.

In sum, Defendant showed that the consumers of the two restaurants were highly unlikely to overlap. In response, Plaintiff provided only hypothetical scenarios suggesting the slight possibility of overlap between the two restaurants in different cities. Accordingly, a reasonable juror could not find any meaningful consumer overlap probable, and the digit weighs substantially in Defendant's favor.

### F. Advertising Media

"The greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 639 (N.D. Tex. 2009) (alterations incorporated). Both restaurants use social media to advertise their restaurants, have profiles on Yelp, and use OpenTable and Resy to let customers make reservations. (Pl.'s Resp., Dkt. 32, at 16–17). The relevance of this digit, however, is limited by the fact that this advertising breaks down by geographic region.[8] The fact that both parties use OpenTable means little if they are located 1,000 miles apart, and users look for reservation by city.

---

[7] The exact fraction is filed under seal.

[8] The Sixth Circuit, for example, examines internet marketing differently, looking at (1) whether the parties use the internet as a substantial marketing channel, (2) whether the product is web-based, and (3) whether the parties' marketing channels overlap in other ways. *Kibler v. Hall*, 843 F.3d 1068, 1079 (6th Cir. 2016). Here, the parties' product (i.e., food) is sold largely in-person. Moreover, the channels cannot be said to "overlap" in the sense that they target different geographic areas.

*See John R. Thompson Co. v. Holloway*, 366 F.2d 108, 111–12 (5th Cir. 1966) (noting neither party advertised nationally and one party advertised only in Dallas/Fort Worth while the other never advertised within Texas). Because there is no evidence that these advertising channels overlap geographically, this factor is neutral.

### G. Defendant's Intent

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion, but if a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of likelihood of confusion." *Bd. of Regents of the Univ. of Hous. Sys.*, 214 F. Supp. 3d at 590 (cleaned up) (quoting *Elvis Presley Enters.*, 141 F.3d at 203). "If there is no evidence of intent to confuse, then this factor is neutral." *Viacom Int'l v. IJR Capital Inv., L.L.C.*, 891 F.3d 178, 192 (5th Cir. 2018). Courts in this circuit focus "on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline*, 851 F.3d at 455. "But mere awareness of the senior user's mark does not establish bad intent." *Id.* at 456 (cleaned up) (quoting *Conan Props., Inc., v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

The undisputed evidence shows that Defendant was aware of the "Summer House Santa Monica" name but not that there was any intent to derive a benefit from its reputation. Defendant knew that Plaintiff owned the mark "Summer House Santa Monica" two years before opening Summer House on Music Lane. (Pl.'s Resp., Dkt. 32, at 17). Nine months before opening, Defendant knew that Plaintiff objected to use of the name. (*Id.*). Ultimately, this evidence does not show any bad faith or intent to derive benefit from the existing mark. As established *infra* Section III.B, "Summer House" is a common name for restaurants. There is minimal overlap between consumers of the two restaurants, and no evidence that the mark had recognition in 2020 in Austin. Because consumer awareness of the mark in Austin was negligible to nonexistent, a reasonable juror would find it difficult to believe Defendant adopted the mark to receive the benefit of the mark's

reputation. Moreover, "Summer House" was already the name of a restaurant that had historically existed on the site, and at least one representative testified that they named the restaurant "Summer House" in part to receive the benefit of the *previous Austin restaurant's* name. (Mot. Summ. J., Dkt. 30, at 17–18; Moore Depo., Dkt. 30-10, at 18). Because Plaintiff can only show that Defendant knew of the mark, but not any intent to derive a benefit from it, the digit is neutral.

### H. Consumer Care

"Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel*, 550 F.3d at 483; *see also Oreck Corp.*, 803 F.2d at 173–74 (reasoning that because purchasers were "buying for professional and institutional purposes at a cost in the thousands of dollars, they are virtually certain to be informed, deliberative buyers") (citation omitted). However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar. *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595–96 (5th Cir. 1985).

Defendant argues that it is "an upscale restaurant that attracts upscale patrons who pay upscale prices," serving entrées averaging around $25 to $40, while Plaintiff argues that the restaurants' brunch, lunch, and happy hour prices are "inexpensive." (Mot. Summ. J., Dkt. 30, at 21; Pl.'s Resp., Dkt. 32, at 13–14). While a reasonable jury could disagree about whether the restaurant's happy hour is "expensive," the dinner prices are clearly above average. Reviewers themselves at Summer House Santa Monica have called the food "expensive" and "pricey" and "upscale." (Bell Dec., Dkt. 33-3, at 185, 201, 130, 282). Overall, the digit leans slightly in Defendant's favor.

### I. Actual Confusion

Actual confusion is the "best evidence of a likelihood of confusion." *Viacom Int'l*, 891 F.3d at 197 (quoting *Elvis Presley Enters.*, 141 F.3d at 203–04). "Even if initial consumer confusion is quickly dispelled, this initial misunderstanding is evidence of confusion." *Id.* "To show actual confusion, a

plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Id.* Importantly, "very little proof of actual confusion" is needed to establish a likelihood of confusion. *Streamline*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 229). "Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion." *Id.* (citing *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). "However, not all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases." *Id.* (internal quotations omitted and alterations incorporated) (quoting *Xtreme Lashes*, 576 F.3d at 230).

To state the matter simply: Plaintiff failed to meet its burden of showing any meaningful actual confusion. Plaintiff provides only two instances of confusion. First, Plaintiff shows texts from a Chicago real-estate developer who texted one of Plaintiff's corporate executives that he found the shared name "CONFUSING." (Text, Dkt. 30-2, at 19). Second, Plaintiff provides one Yelp review of Defendant's restaurant from "Quin T." who gave Summer House on Music Lane 3 out of 5 stars, who said she was "miffed" when she realized the restaurant was not affiliated with Summer House Santa Monica. (Yelp Review, Dkt. 30-1, at 15–16).

This evidence is insufficient to carry Plaintiff's burden at the summary judgment stage. Fifth Circuit cases illustrate that evidence of only *de minimis* confusion supports a finding that there is no likelihood of confusion. *See Soc'y of Fin. Examiners v. Nat'l Ass'n of Certified Fraud Examiners Inc.*, 41 F.3d 223, 228 (5th Cir. 1995) (12 instances of actual confusion over five years "refutes the likelihood of confusion"); *Oreck Corp.*, 803 F.2d at 170 (no instances of actual confusion over 17 months "highly significant" in establishing that confusion is unlikely). Numerous other circuits have likewise declined to find infringement where the instances of actual confusion were extremely limited. *See Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995 (10th Cir. 2014) (finding only *de minimis*

confusion where there was a handful of instances over ten years); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 398–400 (4th Cir. 2009) (handful of instances were *de minimis*); *Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004) ("A single anecdote of confusion over the entire course of competition, however, constitutes *de minimis* evidence insufficient to raise triable issues."); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298–99 (3d Cir. 2001) (affirming district court's finding that 20 instances of confusion over 7 years was *de minimis*).

Moreover, Plaintiff's single instance of consumer confusion must be considered within the context of the restaurant industry. *See George & Co.*, 575 F.3d at 398 ("Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence.") (quoting "Weight of the Evidence", 4 McCarthy on Trademarks and Unfair Competition § 23:14 (5th ed.)). Both restaurants have dozens—if not hundreds—of consumers every day. And each has hundreds of reviews across online sites like Yelp. Since Summer House on Music Lane opened in 2020, there is only one known incidence of consumer confusion in restaurants with tens of thousands of customers in an industry that is particularly likely to leave online reviews. This evidence is *de minimis*.

While the Fifth Circuit has held that evidence of actual confusion is not *always* necessary, it has also suggested that actual confusion can be necessary when the other digits weigh strongly in favor of the defendant. *Streamline*, 851 F.3d at 457; *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 347–48 (5th Cir. 1984). On nearly every digit with probative value, Defendant has shown that there is no likelihood of confusion. The mark is commercially weak. It lacks recognition in Texas. The marks look different. There is no evidence of bad faith. Most crucially, the marks have entirely different consumer bases. In short, there is no reason to suspect any consumer confusion between the marks. Under *Falcon Rice*, Plaintiff should have provided some evidence of actual

confusion. It failed to meet its burden to create a genuine issue of material fact. As a result, summary judgment is proper.

## IV. CONCLUSION

The likelihood of confusion is ordinarily a question of fact. *Elvis Presley Enters., Inc*, 141 F.3d at 196. Still, summary judgment is proper if the "record compels the conclusion that a movant is entitled to judgment as a matter of law." *Smack Apparel*, 550 F.3d at 474. If a reasonable juror could not find that confusion is probable, then a court may grant summary judgment. *Xtreme Lashes*, 576 F.3d at 226. Three factors compel the Court to grant summary judgment: (1) "Summer House" is a commercially weak mark with widespread third-party use, (2) there is no evidence of consumer overlap, and (3) there is *de minimis* evidence of actual confusion. *See Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010) (affirming summary judgment where two restaurants had substantial geographic separation and minimal actual confusion). In light of these factors, a reasonable jury could not find a likelihood of confusion. Accordingly, Defendant is entitled to summary judgment.

For these reasons, Defendant's Motion for Summary Judgment, (Dkt. 30), is **GRANTED**. The Court shall enter final judgment in a separate order.

**SIGNED** on April 6, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE